# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

BLAKE DAVID MARCUM,

      Defendant-Appellant.

UNPUBLISHED
June 8, 2017

No. 330279
Oakland Circuit Court
LC No. 2014-252979-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DONALD MICHAEL-JOHN DAVIS,

      Defendant-Appellant.

No. 330280
Oakland Circuit Court
LC No. 2015-253113-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

TERRENCE RAY BUNTING, JR.,

      Defendant-Appellant.

No. 330558
Oakland Circuit Court
LC No. 2015-253116-FC

---

Before: JANSEN, P.J., and MURPHY and BORRELLO, JJ.

PER CURIAM.

In Docket No. 330279, defendant, Blake David Marcum, appeals as of right his jury trial convictions of felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, conspiracy to commit armed robbery, MCL 750.157a; MCL 750.529, and two counts of possession of a

-1-

firearm during the commission of a felony (felony-firearm), MCL 750.227b. Marcum was sentenced to life in prison without parole for the felony murder conviction, 23 to 60 years' imprisonment each for the armed robbery and conspiracy to commit armed robbery convictions, and two years' imprisonment for each felony-firearm conviction. In Docket No. 330280, defendant, Donald Michael-John Davis, appeals as of right his jury trial convictions of felony murder, armed robbery, and conspiracy to commit armed robbery. Davis was sentenced to life in prison without parole for the felony murder conviction and 23 to 60 years' imprisonment each for the convictions of armed robbery and conspiracy to commit armed robbery. In Docket No. 330558, defendant, Terrence Ray Bunting, Jr., appeals as of right his jury trial convictions of felony murder, armed robbery, conspiracy to commit armed robbery, and two counts of felony-firearm. Bunting was sentenced to life in prison without parole for the felony murder conviction, 23 to 60 years' imprisonment each for the armed robbery and conspiracy to commit armed robbery convictions, and two years' imprisonment for each felony-firearm conviction. We affirm.

This appeal arises from a botched armed robbery, occurring during the early morning hours of November 8, 2014, at an apartment in Waterford Township, Michigan, and resulting in the death of Jacob Hershberger. Defendants Marcum, Davis, and Bunting conspired hours before the armed robbery to enter Hershberger's apartment, where Davis, a friend of Hershberger's, knew that Hershberger kept relatively large amounts of marijuana. Defendants traveled to Hershberger's apartment complex, and Davis assisted Marcum's and Bunting's climb onto Hershberger's balcony. Bunting entered the apartment first, waking Hershberger and Hershberger's girlfriend. A scuffle ensued, as Hershberger and Hershberger's girlfriend attempted to disarm Bunting. Marcum, also armed, entered the apartment and joined the scuffle. One of the firearms discharged, and Hershberger was killed. Defendants fled the scene. Defendants were later arrested and separately charged. Each was convicted by a jury and filed a claim of appeal. Defendants were tried together in the lower court and, for judicial expediency, we have consolidated their cases for consideration. *People v Marcum*, unpublished order of the Court of Appeals, entered October 27, 2016 (Docket Nos. 330279; 330280; 330558).

## I. DOCKET NO. 330279

### A. JUROR SUBSTITUTION

Marcum first argues that the trial court's replacement of a deliberating juror with an alternate juror deprived him of a fair trial. We disagree.

This Court reviews a trial court's decision to replace a deliberating juror with an alternate juror for an abuse of discretion. *People v Tate*, 244 Mich App 553, 562; 624 NW2d 524 (2001). A trial court abuses its discretion only if its decision falls outside the range of principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "Constitutional issues, such as the right to a fair trial, are reviewed de novo." *People v Mahone*, 294 Mich App 208, 215; 816 NW2d 436 (2011).

Selection of Marcum's jury was uneventful, and Marcum's counsel expressly approved the 14 selected jurors. Following trial, Marcum's jury received instructions from the trial court and two of the selected jurors were excused as alternates, leaving 12 jurors to begin

deliberations. The jury deliberated for about 6½ hours on the first day, and made multiple requests for exhibits and transcripts of witness testimony. With counsel's approval, the trial court provided all available exhibits, answered an inquiry regarding witness immunity, and provided the jury with a written copy of its instructions. The trial court dismissed the jurors at about 4:40 p.m., informing them that they would be provided with DVDs of specific witness testimony the following morning. During the second day of deliberations, the jurors requested a definition for the phrase "great bodily harm." The jurors also requested and were provided with a DVD of Marcum's recorded police interview.

At the beginning of the third day of deliberations, the trial court informed counsel that one of the jurors had telephoned to report a visit to the emergency room the previous night for high blood pressure. The juror informed the trial court that he had been instructed to see his primary care physician before returning to jury duty. Marcum's counsel objected to a suggestion from the prosecutor to proceed with only 11 jurors, and requested that deliberations be adjourned until the juror was able to participate. The trial court indicated that it was disinclined to await the availability of the juror. Instead, the trial court dismissed the ailing juror and replaced him with an alternate. The alternate juror appeared at about 11:25 a.m. that morning. The trial judge confirmed that the alternate juror had followed instructions to not discuss the matter, and ensured that she had not learned of the verdicts rendered in Davis's and Bunting's cases. Thereafter, the trial court instructed the reconstituted jury that it was "now a new jury and . . . must start over with [its] deliberations." The jury was dismissed to deliberate at 11:30 a.m., and at 2:34 p.m., the jury indicated that it had reached a verdict.

Generally, "there is no violation of a defendant's right to trial by a fair and impartial jury when an alternate juror is recalled and substituted for a deliberating juror excused by the trial court." *People v Dry Land Marina, Inc*, 175 Mich App 322, 329; 437 NW2d 391 (1989). Indeed, the replacement of jurors is permitted by statute and court rule. MCL 768.18 provides, in relevant part:

> Any judge of a court of record in this state about to try a felony case which is likely to be protracted, may order a jury impaneled of not to exceed 14 members, who shall have the same qualifications and shall be impaneled in the same manner as is, or may be, provided by law for impaneling juries in such courts. All of those jurors shall sit and hear the cause. Should any condition arise during the trial of the cause which in the opinion of the trial court justifies the excusal of any of the jurors so impaneled from further service, he may do so and the trial shall proceed, unless the number of jurors be reduced to less than 12.

The procedure for seating alternate jurors is discussed in MCR 6.411. If a trial court chooses to impanel alternate jurors, MCR 6.411 directs the court to "instruct the alternate jurors not to discuss the case with any other person until the jury completes its deliberations and is discharged," and directs that, "[i]f an alternate juror replaces a juror after the jury retires to consider its verdict, the court shall instruct the jury to begin its deliberations anew." The rules providing for replacement of jurors with alternates are intended to protect a defendant's right to a fair trial. As we explained in *Tate*, 244 Mich App at 562:

[W]hile a defendant has a fundamental interest in retaining the composition of the jury as originally chosen, he has an equally fundamental right to have a fair and impartial jury made up of persons able and willing to cooperate, a right that is protected by removing a juror unable or unwilling to cooperate. Removal of a juror under Michigan law is therefore at the discretion of the trial court, weighing a defendant's fundamental right to a fair and impartial jury with his right to retain the jury originally chosen to decide his fate. [Citation omitted.]

Marcum does not contend that the trial court failed to comply with MCL 768.18 or MCR 6.411 when it replaced the ailing juror with an alternate. However, Marcum argues that he was deprived of a fair trial before an impartial jury because the circumstances surrounding the ailing juror's removal suggest that the ailing juror was a holdout, preventing the jury from reaching a unanimous verdict. Therefore, Marcum argues, the trial court was not permitted to avoid the "manifest necessity" of declaring a mistrial by replacing the ailing juror without holding a hearing to consider whether any reasonable alternative to dismissal of the holdout juror existed. We addressed a similar argument in *Dry Land Marina*, 175 Mich App 322.

In *Dry Land Marina*, the defendant approved a 14 person jury where two of the jurors were designated alternates. *Id.* at 323. After the defendant's jury began deliberations, one of the jurors informed the trial court that she had broken her arm the previous weekend, was having circulatory problems with her hand, was taking pain medication that made her groggy, and would possibly need surgery. *Id.* at 324. Over the defendant's objection, the trial court excused the ailing juror and replaced her with an alternate. *Id.* On appeal, the defendant argued that the trial court was required to make a finding of "manifest necessity" before it could discharge and replace an ailing juror. *Id.* at 325-326. We disagreed, affirming the trial court's exercise of discretion and explaining that the defendant had misconstrued the concept of "manifest necessity." *Id.* at 326. "Manifest necessity," we explained, is a standard governing a trial court's discretion to declare a mistrial over a defendant's objection, and must be established before a trial court, in the interest of justice, exercises its authority to discharge a jury from rendering a verdict. *Id.* We noted that "[a] classic example of manifest necessity requiring discharge of the jury is a hung jury." *Id.* In *Dry Land Marina*, we confirmed that when a trial court is presented with a situation that might support declaration of a mistrial, such as discovery of a hung jury, it "should conduct a hearing on the record to thoroughly consider the situation and make explicit findings that no reasonable alternative exists," before declaring a mistrial on its own initiative. *Id.* at 327. However, a trial court is only required to determine whether "manifest necessity" exists to justify the declaration of a mistrial. A trial court is not required to determine whether "manifest necessity" supports the replacement of an ailing juror with an alternate.

Marcum suggests that the circumstances surrounding the ailing juror's dismissal indicate that the ailing juror was a holdout, and that the jury was deadlocked before his removal. Marcum notes that the juror experienced "high blood pressure, which is associated with being under stress," after two full days of jury deliberations. Over the course of those two days, the jurors submitted numerous requests for additional information, including an inquiry into the definition of "great bodily harm" and another into whether Marcum could be convicted of murder without having actually shot Hershberger. Additionally, despite the fact that the reconstituted jury was instructed to start its deliberations anew, it returned a verdict in less than three hours.

Marcum's attempt to frame the trial court's replacement of an ailing juror as a replacement of a holdout is based on speculation. The record contains no evidence that the jury was deadlocked, that the ailing juror was a holdout, or that the ailing juror's emergency room visit was related to the stress of jury deliberation. Although the jurors asked to review exhibits and instructions, they never indicated that they would have trouble reaching a unanimous verdict or suggested that any of the jurors was incapable of complying with the trial court's instructions. The jury reached a verdict relatively quickly after the ailing juror was replaced, but there is nothing to indicate that the alternate juror improperly influenced subsequent deliberations or was coerced into agreement. The alternate juror was properly instructed before her initial release that she was not to discuss the case or seek outside information. Upon her return, the trial court confirmed her adherence to these instructions. Complying with MCR 6.411, the trial court also properly instructed the newly formed jury that it was to begin deliberations anew. "[T]he jury is presumed to have followed its instructions," *Mahone*, 294 Mich App at 217-218, and there is nothing in the record to indicate that the jury did not do so here.

The "manifest necessity" standard simply does not apply here. No situation requiring the trial court to declare a mistrial was presented, and Marcum did not request a mistrial in lieu of the ailing juror's replacement. Although Marcum takes issue with the trial court's failure to consider the extent of the ailing juror's injuries or the amount of time the ailing juror would need to recover, the trial court was not required to consider other reasonable alternatives before replacing the ailing juror. Regardless, we made clear in *Dry Land Marina* that the decision to call an alternate juror *is* a "reasonable alternative" to a mistrial. *Dry Land Marina*, 175 Mich App at 327. The fact that other reasonable alternatives exist does not render a trial court's decision to seat an alternate juror an abuse of discretion, even in cases where a mistrial is imminent. *Id*.

There is ample precedent to support the trial court's decision to dismiss the ailing juror and replace him with an alternate. After considering the facts presented in *Dry Land Marina*, we concluded

> that the decision of the trial court to excuse the ailing juror constituted a proper
> exercise of judicial discretion supported by fact and logic. The juror had a real or
> imagined physical disability and was obviously reluctant to cooperate, as
> evidenced by her failure to appear or call the court that morning. [*Id*. at 326.]

We reached a similar conclusion, on comparable facts, in *Tate*, 244 Mich App at 557-559. In that case, a seated juror informed the trial court after several days of deliberation that she had "developed an itchy rash that might be contagious and for which her pharmacist had recommended that she see a doctor that day." *Id*. at 556. The itching juror was dismissed and the trial court seated an alternate after ensuring that the alternate had followed an instruction to not discuss the case. *Id*. at 556-557. The jury returned a verdict later that same day. *Id*. at 557. On appeal, the defendant argued that the trial court abused its discretion when it excused the itching juror and seated an alternate without ascertaining whether the excused juror's rash was actually contagious and she was unable to continue with deliberations. *Id*. at 557-558. We disagreed, comparing the situation to the facts presented in *Dry Land Marina* and concluding:

> In this case, the court was concerned about the juror's discomfort, was concerned that the rash might be contagious, and was advised that the juror's pharmacist told her to see her doctor that very day. We similarly conclude, especially because of the potential that the rash might have been contagious to the other jurors, that the trial court did not abuse its discretion in dismissing the juror. [*Id*. at 560.]

Here, also, the trial court had the legal authority to dismiss the ailing juror and acted well within its discretion when it did so. By the time the deliberating juror was taken ill, the jurors had sat through eight full days of trial. Had the trial court declined to replace the ailing juror, deliberations would have been pushed back at least two more days. The trial court recognized that there was no guarantee that the ailing juror would ever be able to return to service, and reasonably chose to continue deliberations with an alternate. In Marcum's case, as in *Dry Land Marina* and *Tate*, "the decision . . . to excuse the ailing juror constituted a proper exercise of judicial discretion supported by fact and logic." *Tate*, 244 Mich App at 562, quoting *Dry Land Marina*, 175 Mich App at 326.

Marcum attempts to distinguish his case from *Dry Land Marina* and *Tate*, arguing that in both cases, the defendant suffered no prejudice because there was no indication that the dismissed juror may have been a holdout or held a minority opinion. However, as previously discussed, no such evidence was presented here. Marcum's case is therefore indistinguishable from these and other cases endorsing the trial court's broad discretion to dismiss an ill or noncompliant juror and replace him or her with an alternate under MCL 768.18 and MCR 6.411.

## B. RIGHT TO A PUBLIC TRIAL

Next, Marcum argues that the trial court violated his right to a public trial when it restricted access to the courtroom during trial. We disagree.

In this consolidated trial, each defendant was permitted to choose his own jury. Over objection from defense counsel, the trial court explained that attendance restrictions were necessary to protect the sanctity of the three juries, ensuring that each would have space to observe without distraction by or interference from onlookers. Recognizing the interest of each defendant in having family members present in the courtroom, the trial court allowed each defendant to select two individuals to attend the proceedings in person. For additional members of the public who wished to observe the proceedings, the trial court ordered a live streaming of the trial in a room adjacent to the courtroom.

Marcum argues that the judicial economy of consolidating three trials was an interest insufficient to overcome his right to a public trial, and the trial court committed constitutional error when it ordered the partial closure of the courtroom. We review de novo whether a trial court violated a defendant's right to a public trial as a question of law. *People v Vaughn*, 491 Mich 642, 649-650; 821 NW2d 288 (2012).

"The right to a public trial 'has its roots in our English common law heritage,' " *Vaughn*, 491 Mich at 650, quoting *In re Oliver*, 333 US 257, 266; 68 S Ct 499; 92 L Ed 682 (1948), and is expressly enumerated in the Michigan Constitution and in the Sixth Amendment to the United States Constitution. *Vaughn*, 491 Mich at 650, citing US Const, Am XI; Const 1963, art 1 § 20.

However, "[a] defendant's . . . right to a public trial is limited, and there are circumstances that allow the closure of a courtroom during any stage of a criminal proceeding, even over a defendant's objection[.]" *Vaughn*, 491 Mich at 653.

> "[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." [*Id.*, quoting *Presley v Georgia*, 558 US 209, 214; 130 S Ct 721; 175 L Ed 2d 675 (2010) (citation omitted).]

These requirements are reflected in our court rules. In relevant part, MCR 8.116(D), which encompasses "access to court proceedings," provides:

> (1) Except as otherwise provided by statute or court rule, a court may not limit access by the public to a court proceeding unless
>
> (a) a party has filed a written motion that identifies the specific interest to be protected, or the court sua sponte has identified a specific interest to be protected, and the court determines that the interest outweighs the right of access;
>
> (b) the denial of access is narrowly tailored to accommodate the interest to be protected, and there is no less restrictive means to adequately and effectively protect the interest; and
>
> (c) the court states on the record the specific reasons for the decision to limit access to the proceeding.

"[T]he effect of a partial closure of trial does not reach the level of a total closure and only a substantial, rather than a compelling reason for the closure is required." *People v Russell*, 297 Mich App 707, 720; 825 NW2d 623 (2012). The limited capacity of a courtroom is a substantial reason for closure, and a partial closure of the courtroom to account for its limited capacity does not deny a defendant his right to a public trial. *Id.* "However, even where the reason offered is space limitations, the court must still narrowly tailor the closure order." *In re Closure of Jury Voir Dire*, 204 Mich App 592, 595; 516 NW2d 514 (1994).

Here, the trial court complied with the requirements of MCR 8.116(D), and its decision to partially close the courtroom during defendants' trial did not deprive Marcum of his right to a public trial. First, the trial court identified a specific interest to be protected, i.e., each defendants' interest in being tried by a fair and impartial jury. The trial court explained that to avoid the potential for influence or interaction with members of the public and ensure each jury's ability to observe the proceedings without obstruction, each jury would require a certain amount of physical space. The trial court's restrictions were narrowly tailored and no broader than necessary to protect the interest of all three defendants in maintaining an independent jury.

Additionally, the trial court was careful to ensure fair public access to defendants' trial. The trial court opened the entire courtroom to the public each time only one jury was present.

Restrictions on access to the courtroom were not imposed during the jury selection proceedings, closing arguments, or final jury instructions. The trial court allowed each defendant to choose two family members who would be permitted inside the courtroom at all times, and established viewing areas inside the courthouse where any other interested members of the public could view a live video stream of the trial. When technical difficulties occurred with the transmission of the proceedings to the overflow courtroom, the trial court halted the trial until the issue could be resolved and the live stream transmission resumed.

The trial court's restrictions were appropriate to address the significant interest at stake and no broader than necessary to adequately protect that interest. Marcum was therefore not deprived of his constitutional right to a public trial.

## II. DOCKET NO. 330280

### A. FIFTH AMENDMENT VIOLATION

Davis asserts that the trial court erred when it denied his motion to suppress statements Davis made during his police interview. Davis argues that the officers failed to acknowledge his repeated requests for counsel and violated his Fifth Amendment right to counsel when they continued their interrogation. We disagree.

We review de novo a trial court's ultimate decision on a motion to suppress evidence. *People v Henry (After Remand)*, 305 Mich App 127, 137; 854 NW2d 114 (2014). However, the trial court's factual findings are reviewed for clear error. *Id.* "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013). "[T]o the extent that a ruling involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *People v Russell*, 471 Mich 182, 187; 684 NW2d 745 (2004).

It is well-recognized that criminal suspects are afforded specific safeguards against involuntary self-incrimination during custodial interrogations. See *People v Adams*, 245 Mich App 226, 230-231; 627 NW2d 623 (2001); see also *Michigan v Mosley*, 423 US 96, 99; 96 S Ct 321; 46 L Ed 2d 313 (1975); *Miranda v Arizona*, 384 US 436, 444-445; 86 S Ct 1602; 16 L Ed 2d 694 (1966). These safeguards include the right to have an attorney present. *People v Marsack*, 231 Mich App 364, 372-373; 586 NW2d 234 (1998) ("[T]he Fifth Amendment right to counsel is a corollary to the amendment's stated right against self-incrimination and to due process."). When a defendant has "expressed his desire to deal with the police only through counsel, [the defendant] is not subject to further interrogation by the authorities until counsel has been made available. . . ." *People v Tanner*, 496 Mich 199, 208-209 (2014), quoting *Edwards v Arizona,* 451 US 477, 484-485, 101 S Ct 1880, 68 L Ed 2d 378 (1981). However, "invocation of the *Miranda* right to counsel requires a statement that can reasonably be construed to be an expression of a desire for the assistance of counsel." *Adams*, 245 Mich App at 237. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis v US*, 512 US 452, 459; 114 S Ct 2350; 129 L Ed 2d 362 (1994); see also *Adams*, 245 Mich App at 237-238.

Here, the trial court did not err in denying Davis's motion to suppress because Davis's request for counsel was not clear and unequivocal, and the officers' decision to proceed with questioning did not violate Davis's right against self-incrimination. Davis was interviewed by officers Brent Ross and Christopher Belling after he voluntarily appeared for questioning. The officers read Davis his rights pursuant to *Miranda*, and Davis concedes that he voluntarily signed a waiver. Davis initiated the exchange, explaining: "Soon as I had word that you guys were looking for me I'm like alright, I got no reason to run. That's why I called you." Thereafter, the officers introduced themselves and asked Davis how he was doing. Davis replied: "Stressing. I do need an attorney but I'm gonna talk to you guys like I'm trying to say." Without further prompting, Davis continued: "I just really need to know exactly what you guys need. My mom say you guys say I got information, like, can you explain it better?" Davis proceeded to volunteer information and respond to the officers' questions. He did not make further mention of his need for an attorney until later in the interview, when the officers asked to "borrow" Davis's cell phone in order to download the directory. At first, Davis refused to turn over his phone, explaining that it contained pictures of his girlfriend that he did not want the officers to see. Eventually, after additional requests from the officers, Davis finally agreed to turn over the phone. Davis expressed his displeasure at having to turn over his cell phone after voluntarily agreeing to cooperate. During the exchange, Davis again mentioned an attorney:

> [*Davis*]: Not saying, not getting no type of privacy, you want the whole phone downloaded, I don't know, you guys can download it I don't care, I'm not saying you can't *but after this though I'm done talking, just get an attorney or something*, I'm. [sic]

> [*Ross*]: I'll give [the phone] back to your mom.

> *Davis*: Then I'm already upset, like, this was my friend man, that's the only reason I'm here talking to you guys because I'm not putting myself in a situation where I never did nothing, like.

> *Ross*: Let me back up. We're not here to push you we're here to push the whole thing we want to find.

> *Davis*: I want you guys to find them.

> *Ross*: Right, so you and I are on the same page (inaudible). [Emphasis added.]

Davis insisted that he was "[m]ore than willing to help." He continued to volunteer information and, in response, the officers resumed their questioning. Davis did not mention an attorney for the rest of the interview, and continued to provide information regarding the events that took place on the night of Hershberger's death. At several points, Davis confirmed his willingness to cooperate and continue with the interview, assuring the officers that he was "in here trying to help you guys, I'm giving you all the information I can get," and, later, "If I was to think of anything else I will let you know, any piece of detail I can think of I'll be sure to let you guys know." When asked for his full cooperation, Davis stated that he would "[g]ive everything I got man."

The officers conducted another interview with Davis on the following day. When the officers reminded Davis of his rights pursuant to *Miranda*, Davis responded: "I know, still need an attorney but I'm still talking to you guys, right . . . I'm not, not hiding nothing so, lay it down I'm ready." Belling confirmed: "So, understanding ah, those apply [to] you, you still want to talk to us ah, because we want to clarify some stuff with you." Davis responded: "I'm ready." Davis proceeded to provide additional details regarding the events surrounding the armed robbery. Davis made one other mention of an attorney during the second interview. When Belling suggested that Davis would be better off if he provided honest answers, Davis replied:

> Yeah pretty much. See that's the only reason I do still need an attorney though. Cause I wasn't behind murder. Wasn't, wasn't behind armed robbery, wasn't behind none of that b*******. I never entered a home or nothing. That's the only reason I don't want to do all these years of my life for something I literally damn near had no control over, besides showing em, hey we can get weed here[.]

Later, Davis reaffirmed his commitment to cooperation: "Didn't have to say s*** no, I'm actually being cool with you guys, I want them caught, I'm happy you guys caught them."

After Davis was charged with felony murder, in addition to armed robbery, conspiracy to commit armed robbery, and felony-firearm, he moved to suppress all of the statements he made during the interview after he told the officers, "after this though I'm done talking, just get an attorney or something[.]" The trial court took testimony from Belling and Ross at a hearing on Davis's motion. Belling and Ross confirmed that Davis had voluntarily waived his right to remain silent and to have an attorney present. The officers explained that although Davis acknowledged the need for an attorney, they continued their questioning because Davis demonstrated a willingness and desire to continue the exchange. The trial court reviewed DVD recordings of both interviews before issuing a written opinion and order finding Davis's statements equivocal, given his desire to cooperate and provide information to the officers, and denying the motion to suppress.

We find no error in the trial court's decision to deny Davis's motion to suppress. Following Davis's waiver of his *Miranda* rights, Davis did not clearly and unequivocally invoke his right to counsel. Rather, Davis voluntarily and repeatedly engaged with the officers, offering them information and expressing his desire to cooperate. Davis's vague statements regarding a need for an attorney were inconsistent with his insistence that he wished to provide additional information, and his claim that he wanted questioning to cease is belied by the detailed and prolonged explanations he gave in response to the officers' inquiries. Davis's comments suggest that he was aware of his right to counsel, and knew that a request for an attorney would stop the interview. Nevertheless, Davis chose to continue. Overall, the tenor of the interview indicated a cooperative exchange of information, with Davis repeatedly affirming his desire to assist the detectives in the identification of the perpetrators. Despite Davis's assertion to the contrary, none of his statements could reasonably be construed as an expression of Davis's desire for the assistance of counsel. Without a clear and unequivocal request for counsel, the officers were not required to cease questioning. Suppression of Davis's statements was not required.

B.  SUFFICIENCY OF THE EVIDENCE

Davis also argues that insufficient evidence was presented at trial to support his convictions of armed robbery and felony murder.  We disagree.

A challenge to the sufficiency of evidence is reviewed de novo, *People v Harverson*, 291 Mich App 171, 175; 804 NW2d 757 (2010), but "a reviewing court is required to draw all reasonable inferences and make credibility determinations in support of the jury verdict," *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).  "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of [a] crime."  *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).  This Court must review the evidence in a light most favorable to the prosecution and determine whether the jury could have found each element of the charged crimes proved beyond a reasonable doubt.  *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

"The elements of armed robbery are: (1) an assault and (2) a felonious taking of property from the victim's presence or person (3) while the defendant is armed with a weapon."  *People v Smith*, 478 Mich 292, 319; 733 NW2d 351 (2007).  Defendant was convicted of armed robbery under an aiding and abetting theory.  Aiding and abetting describes "any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime."  *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004).  To demonstrate that a defendant aided and abetted a crime, a prosecutor is required to show that:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [he] gave aid and encouragement.  [*People v Plunkett*, 485 Mich 50, 61; 780 NW2d 280 (2010) (quotation marks and citation omitted).]

"An aider and abettor's state of mind may be inferred from all the facts and circumstances." *People v Carines*, 460 Mich 750, 758; 597 NW2d 130 (1999) (citation omitted).  "Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime."  *Id*.  "A defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as those crimes that are the natural and probable consequences of the offense he intends to aid or abet."  *People v Robinson*, 475 Mich 1, 15; 715 NW2d 44 (2006).

Viewed in a light most favorable to the prosecution, the evidence presented at trial was sufficient to support Davis's armed robbery conviction.  A witness testified to overhearing Davis, Marcum, and Bunting at the home of a mutual acquaintance, just before the armed robbery, discussing their plan to "hit a lick," or, in colloquial language, to commit a robbery. Marcum and Bunting were later identified by an eyewitness as the perpetrators of the armed robbery.  Testimony also established that Marcum and Bunting were carrying firearms before the robbery, and that Davis knew they were armed.  Another witness, who observed defendants just before the robbery, thought Davis might have been carrying a handgun.  Although, as Davis

points out, no direct testimony established that Davis was armed before or during the robbery, Davis's conviction did not require proof that Davis was carrying a weapon.

In a police interview, Davis acknowledged directing Marcum and Bunting to the Hershberger apartment, and it was Davis who had knowledge of how to gain entry through the balcony. Davis admitted that he assisted Marcum in the armed robbery, physically hoisting Marcum onto Hershberger's balcony and waiting during the commission of the armed robbery. Additionally, telephone records indicated that Davis had attempted to contact Hershberger immediately before the armed robbery, which occurred during early morning hours. Sufficient evidence was therefore presented to establish that an armed robbery was committed, Davis was involved in both the planning and the execution of the crime, and that Davis intended to assist in the commission of the crime.

Viewed in a light most favorable to the prosecution, the evidence presented at trial was also sufficient to support Davis's felony murder conviction. "The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). The predicate felony relied upon by the prosecution here was armed robbery, and "robbery" is a specifically enumerated predicate felony under MCL 750.316(1)(b).

Davis was convicted of felony murder as an aider and abettor. Again, "[t]o establish that a defendant aided and abetted a crime, the prosecutor must prove that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the principal in committing the crime," *People v Norris*, 236 Mich App 411, 419; 600 NW2d 658 (1999), and (3) "the defendant intended to aid the charged offense, knew the principal intended to commit the charged offense, or, alternatively, that the charged offense was a natural and probable consequence of the commission of the intended offense," *Robinson*, 475 Mich at 15.

With respect to felony murder, defendant challenges the sufficiency of the evidence presented to support the element of malice, arguing that there was no evidence presented to support an intent to "create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." Due to the difficulties inherent in "proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999). Malice may be inferred from evidence "that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Carines*, 460 Mich at 759. A jury may also infer malice "from the use of a deadly weapon." *Id*. With respect to felony murder, "[a] jury may infer that the defendant aided and abetted the killing by participating in the underlying offense." *People v Bulls*, 262 Mich App 618, 625; 687 NW2d 159 (2004).

As previously discussed, sufficient evidence was presented to support the inference that Davis aided and abetted the armed robbery. Sufficient circumstantial evidence was also presented to support the inference that Davis possessed the requisite malice to support his felony

murder conviction. During his interviews with police, Davis acknowledged accompanying Bunting and Marcum to Hershberger's apartment. Davis admitted that he showed his cohorts where Hershberger lived, explained how they could gain entry to the apartment building, assisted Bunting in gaining access to the balcony, and knew that Bunting and Marcum were armed and intended to commit a robbery. Davis's act of providing directions and physical assistance to Marcum and Bunting, coupled with his awareness that they were armed and intended to commit a robbery, was sufficient to establish that Davis acted with an intent to "create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." Davis willingly participated in the predicate felony offense and thereby "intentionally set in motion a force likely to cause death or great bodily harm."

Taken in a light most favorable to the prosecution, the evidence supported the jury's conclusion that Davis intended to assist in the armed robbery with knowledge that death or great bodily harm may result. Davis's armed robbery and felony murder convictions were proper.

## C. PROSECUTORIAL MISCONDUCT

In his Standard 4 brief, Davis asserts multiple instances of purported misconduct by the prosecutor. Specifically, Davis claims that the prosecutor engaged in misconduct and deprived Davis of a fair trial by: (1) implying during voir dire that Davis robbed Hershberger, (2) indicating distaste for appellate courts, (3) suggesting during opening statements that Davis possessed a weapon and participated in the plan to rob Hershberger, (4) commenting on Davis's veracity during opening statements, (5) distorting the facts during closing arguments by suggesting that Davis possessed a weapon and entered the Hershberger apartment, (6) leading witnesses during trial, and (7) presenting evidence in an imbalanced manner. We disagree.

Defendant failed to preserve his claims of prosecutorial misconduct with contemporaneous objections to the alleged misconduct at trial and a request for curative instructions. *Bennett*, 290 Mich App at 475. "Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights." *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). A plain error is one that is "clear or obvious," and the error must affect the defendant's "substantial rights." *Carines*, 460 Mich at 763. In other words, the defendant must have been prejudiced by the plain error. *Id.* "Under the plain error rule, reversal is only warranted if the defendant is actually innocent or the error seriously undermined the fairness, integrity, or public reputation of the trial." *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006).

"[T]he propriety of a prosecutor's remarks will depend upon the particular facts of each case." *People v Callon*, 256 Mich App 312, 330; 662 NW2d 501 (2003). This Court must examine the entire record and consider the challenged remarks in context. *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). Specifically, a prosecutor's comments should be evaluated in light of defense arguments and the relationship the comments bear to the evidence presented at trial. *People v Brown*, 267 Mich App 141, 142; 703 NW2d 230 (2005). Prosecutors may not make factual statements that are not supported by the evidence, but are typically afforded great latitude regarding their arguments. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Prosecutors should not express their personal opinion of a defendant's guilt, or denigrate a defendant with intemperate and prejudicial remarks. *Id.* at 283. Otherwise, they

are generally free to argue the evidence and all reasonable inferences as may relate to their theory of the case, and are not required to confine their statements to the blandest possible terms. *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007).

Davis challenges two specific remarks made by the prosecutor during voir dire. Our review of the entire record reveals that neither remark was improper or deprived Davis of a fair trial. First, Davis alleges that the prosecutor's statement to the prospective jury panel that "the people that robbed Jacob Hershberger, they robbed him for money and for marijuana," was improper. The prosecutor's comment was a direct referral to the description of Davis's offense in the information, which the trial court read aloud to the prospective jurors. The prosecutor was allowed to argue the facts presented, and evidence presented at trial clearly established that Davis and his companions conspired to enter Hershberger's apartment for the purpose of stealing cash and marijuana. Next, Davis challenges a statement the prosecutor made in response to a comment from opposing counsel. After defense counsel suggested that he would challenge a juror for bias, the prosecutor responded: "I don't like the Appellate Court as much as you do, so I'd rather not create an issue." The prosecutor's reference to appellate courts was permissible and made in response to a specific comment by defense counsel. The prosecutor merely indicated that he would concur in defense counsel's request to dismiss a juror for cause in order to prevent error necessitating intervention by appellate courts. The prosecutor's response did not hint of misconduct, but evidenced a concern for the fairness and integrity of the proceedings.

Davis also challenges comments made by the prosecutor during opening statements, arguing that the prosecutor improperly suggested that Davis participated in the planning of the robbery, carried a weapon during the commission of the offense, and was generally untrustworthy. These comments were supported by the evidence later presented at trial, including Davis's own statements. Witnesses testified that Davis discussed the robbery with Marcum and Bunting immediately before it occurred, and that Davis may have possessed a firearm immediately before the robbery. During his police interview, Davis changed his story multiple times. Again, a prosecutor is permitted to argue the facts presented and all reasonable inferences to be drawn therefrom, including inferences related to witness credibility. *People v Unger*, 278 Mich App 210, 240; 749 NW2d 272 (2008).

Davis also takes issue with similar statements made during the prosecutor's closing arguments. Specifically, the prosecutor argued that Davis's involvement in the armed robbery was supported by evidence that Davis possessed a weapon, Davis entered Hershberger's apartment building, and Davis lied during his police interview. Again, the prosecutor's comments were supported by the evidence and not improper. Further, the prosecutor was afforded broad latitude in crafting his statements, and his description of Davis's statements as "lies" did not rise to the level of prosecutorial misconduct. See *People v Fyda*, 288 Mich App 446, 462; 793 NW2d 712 (2010).

Even if the prosecutor's statements had been improper, a new trial would not be warranted. Reversal for prosecutorial misconduct is warranted only where a curative instruction could not have alleviated any prejudicial effect. *Unger*, 278 Mich App at 235. The trial court twice instructed the jurors that they must only consider the evidence before them, and that the lawyer's arguments are not evidence. Jurors are presumed to follow their instructions, and curative instructions are sufficient to alleviate the prejudicial effect of most inappropriate

-14-

prosecutorial statements. *People v Abraham*, 256 Mich App 265, 278-279; 662 NW2d 836 (2003).

Finally, Davis generally asserts that the prosecutor engaged in misconduct by leading various witnesses and providing an unbalanced presentation of the evidence. However, Davis has not cited to any specific statements or explained how or when the claimed misconduct occurred. A defendant may not simply "announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001) (quotation marks and citation omitted). An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue. *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004).

## D. JUROR BIAS

In his Standard 4 brief, Davis also alleges innumerable problems pertaining to the selection and composition of his jury, arguing that these problems, in the aggregate, biased his jury and resulted in an unfair trial. However, Davis's defense counsel affirmatively indicated his satisfaction with the jury selected. "An expression of satisfaction with a jury made at the close of voir dire examination waives a party's ability to challenge the composition of the jury thereafter impaneled and sworn." *People v Hubbard*, 217 Mich App 459, 466; 552 NW2d 493 (1996), overruled in part on other grounds by *People v Harris*, 495 Mich 120; 845 NW2d 477 (2014). Therefore, there is no error for this Court to review. See *Vaughn*, 491 Mich at 663 ("A defendant who waives a right extinguishes the underlying error and may not seek appellate review of a claimed violation of that right.").

## E. JUDICIAL MISCONDUCT

Lastly, in his Standard 4 brief, Davis alleges judicial misconduct depriving Davis of his right to a fair trial. Specifically, Davis challenges a brief comment made by the trial judge during voir dire, upon the excusal of a prospective juror of certain celebrity identified as Robert Richie ("Kid Rock"). As Kid Rock exited the courtroom following dismissal for cause, the trial judge commented: "Maybe we could get an autograph." Davis insists that the trial judge's comment made a mockery of the judicial system, and encouraged prospective jurors to approach Davis's trial as a less-than-serious matter. We disagree.

The United States and Michigan Constitutions both guarantee a defendant the right to a fair and impartial trial. See US Const, Am VI; Const 1963, art 1, § 20. "The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). In *Stevens*, 498 Mich at 170, our Supreme Court clarified the proper analysis under which a claim of judicial misconduct is to be reviewed:

> A trial judge's conduct deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of

-15-

the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. [Citations omitted.]

Judicial misconduct may include belittling counsel, asking inappropriate questions of witnesses, providing improper strategic advice to one side, or submitting biased commentary in front of the jury. *Id*. at 172-173. "A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality." *Id*. at 171. An inquiry into judicial misconduct is fact-specific, and any alleged improper comments must be considered within the context of a given case. *Id*. at 172. Specifically, the reviewing court should inquire into the nature of the judicial conduct at issue, the tone and demeanor of the trial judge, the scope of the allegedly improper conduct in the context of the length and complexity of the proceedings, the extent to which the judge's conduct was disproportionately directed to one side, and the presence of curative instruction. *Id*.

We are not persuaded that the trial judge's isolated comment, while perhaps inappropriate, compromised or demeaned the integrity of Davis's trial. On review of the transcript, we note that the trial judge's comment was random, a seemingly simple acknowledgment of the obvious celebrity of the prospective juror. The trial judge's comment was brief and reflective of the interest of other prospective jurors, presumably piqued by the presence of a recognizable local celebrity. The comment was not accompanied by any improper conduct, as no autograph was actually pursued or obtained. Further, the comment did not result in a break in the proceedings. The next prospective juror was immediately called and questioning initiated. Davis has not suggested that the trial judge engaged in any other inappropriate behavior, and our review of the record confirms that the trial judge conducted herself in a serious and professional manner throughout the criminal proceedings. Considering the totality of the circumstances, it is not reasonably likely that the trial judge's conduct improperly influenced the jury or created the appearance of bias against defendant.

## III. DOCKET NO. 330558

Bunting argues that insufficient evidence was presented at trial to support his conviction of felony murder. We disagree.

Bunting does not deny that he was armed or that he took part in the robbery of Hershberger's apartment. Bunting concedes that he intended to assist in the armed robbery, and the evidence was clearly sufficient to support his armed robbery conviction. Bunting was identified as a perpetrator by an eyewitness, and was observed in the company of Marcum and Davis in the hours before the armed robbery. During a police interview, Bunting admitted that defendants planned to obtain cash and drugs from Hershberger's apartment, and acknowledged carrying a handgun. Bunting's fingerprint was discovered on a handgun found in the hallway outside Hershberger's apartment after the armed robbery.

Like Davis, Bunting argues only that the evidence was insufficient to prove that he possessed the requisite intent to support a conviction of felony murder. Again, for a conviction of felony murder on an aiding and abetting theory, the prosecutor must prove beyond a reasonable doubt that the defendant acted with the intent "to aid the charged offense, knew the

-16-

principal intended to commit the charged offense, or, alternatively, that the charged offense was a natural and probable consequence of the commission of the intended offense," *Robinson*, 475 Mich at 15.

Bunting insists that he had no knowledge of Marcum's intent to shoot Hershberger. And while Bunting concedes that murder is a "possible" consequence of an armed robbery, Bunting argues that he could not have acted with the requisite malice because murder is not a "natural and probable consequence" of an armed robbery. We disagree. It is clear that one natural and probable consequence of a plan to commit armed robbery is that one of the individuals involved will use his weapon, thereby escalating the robbery into a murder.

Bunting also contends that to hold him liable for a murder he did not intend or expect would be unfair, citing a passage from this Court's opinion in *People v Turner*, 213 Mich App 558, 566-567; 540 NW2d 728 (1995), overruled in part on other grounds in *People v Mass*, 464 Mich 615, 628; 628 NW2d 540 (2001):

> In situations involving the vicarious liability of cofelons, the individual liability of each felon must be shown. It is fundamentally unfair and in violation of basic principles of individual criminal culpability to hold one felon liable for an unforeseen death that did not result from actions agreed upon by the participants. In cases where the felons are acting intentionally or recklessly in pursuit of a common plan, liability may be established on agency principles. If the homicide is not within the scope of the main purpose of the conspiracy, those not participating are not criminally liable. [Citations omitted.]

However, our decision in *Turner* does not support Bunting's argument. The above-cited passage clearly limits liability to co-conspirators who have agreed to commit an act resulting in an unforeseen death, and does not apply here. Indeed, in *Turner*, we held that evidence of one co-conspirator's knowledge of another's possession of a firearm during the commission of an armed robbery, ultimately resulting in an unintended homicide, was sufficient to support the malice element of felony murder. *Id.* at 572.

Although we are sympathetic to Bunting's predicament, we conclude that sufficient evidence was presented to support the inference that Bunting possessed the requisite malice to support his felony murder conviction. Bunting admits that he agreed to take part in the armed robbery, "acting intentionally . . . in pursuit of a common plan." Bunting assisted in the armed robbery of Hershberger's apartment, entering an occupied dwelling armed with a handgun in the middle of the night. Hershberger's murder, while perhaps unintended, resulted from the armed robbery. Evidence of Bunting's participation in the armed robbery, possession of a weapon, and knowledge of his codefendant's possession of a weapon, was sufficient to establish that Bunting acted with an intent to "create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result," and support a finding of malice to support his felony murder conviction.

Affirmed.

/s/ Kathleen Jansen
/s/ William B. Murphy
/s/ Stephen L. Borrello